UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DERRICK DOTSON, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | 1:10-cv-1175-LJM-DML |
| | ) | |
| AT&T SERVICES, INC., | ) | |
|     Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This mater comes before the Court on Defendant's, AT&T Services, Inc. (the "Company"), motion for summary judgment [dkt. no. 39]. Plaintiff, Derrick Dotson ("Dotson"), alleges that the Company engaged in race discrimination when it terminated his employment in violation of Title VII, 42 U.S.C. § 2000 et al., and 42 U.S.C. § 1981. For the following reasons, the Court **GRANTS** the Company's motion [dkt. no. 39].

**I. BACKGROUND**

Dotson, an African-American, began working full-time for the Company in 1994. Dotson Aff. at ¶¶ 1-3. At all times during his employment, Dotson was a member of the Communication Workers of America Union (the "Union"). Dotson Dep. at 26. In 2008, Dotson began working for the Company as a Heavy Vehicle Driver. Dotson Aff. at ¶ 4. As a Heavy Vehicle Driver, Dotson worked out of the Company's location at 5206 Rockville Road, Indianapolis, Indiana ("Rockville Road"), and reported directly to Donna Earnest ("Earnest"), a First-Line Manager in supply chain logistics. Dotson Dep. at 31. Earnest reported to Phil Gleissner ("Gleissner"), an Area Manager in supply chain logistics, who in

turn reported to Dave Lawton ("Lawton"), the Director of supply chain logistics. Earnest Dep. at 6-7. As a Heavy Vehicle Driver, Dotson's duties included the delivery of telephone poles, cable, innerduct, and other equipment used to maintain the Company's telecommunications network. Dotson Dep. at 32-33, 38-39. Dotson drove Company-owned semi-trailer trucks and other large vehicles, the operation of which required him to possess a valid Class A Commercial Drivers License ("CDL"). Dotson Dep. at 32-33.

The Company has adopted and disseminated to its workforce a "Code of Business Conduct" ("COBC") that provides general standards of behavior that the Company expects all employees to follow in the workplace and in conducting Company business. Dotson Dep. at ex. 4. The COBC has a provision titled "On and Off Duty Misconduct," which states in relevant part:

> While AT&T employees' personal lives are their own as a general matter, off-duty misconduct can affect an employee's work. Always avoid conduct that could impair work performance or negatively affect the company's reputation or business interests.
>
> Employees have certain reporting requirements related to arrests, charges, convictions, guilty pleas, pleas of "no contest" and similar dispositions as well as traffic tickets, accidents, citations, which are described below. These reporting requirements apply to conduct both on and off the job.
>
> All employees, regardless of their job duties, must report:
>
> - All arrests, charges, convictions, guilty pleas, pleas of "no contest" and similar dispositions for non-driving-related criminal offenses.
>
> - All traffic tickets, citations, arrests charges, convictions, guilty pleas, pleas of "no contest" and similar dispositions for any driving-related offense that involves intoxication, such as driving while intoxicated, driving under the influence and any similar offenses.
>
> - Any other conduct that may affect your ability to perform your job.
>
> Employees whose job involves the operation of a company-owned or

2

>    company-leased motorized vehicle or aircraft must also report the following:
>
>    - All accidents,
>
>    - All tickets, citations, arrests, charges, convictions, guilty pleas, pleas of "no contest" and similar dispositions for any driving-related offense other than parking tickets, equipment violations or other non-moving violations,
>
>    -Any other issue that impacts the status of your driver's or pilot's license.
>
> All required reports must be made in writing to the employee's supervisor immediately upon returning to work after the reportable event.
>
> The employee's supervisor is then responsible for immediately forwarding a copy of the employee's written notification to HR.
>
> HR will determine whether the matter needs to be reported to Asset Protection. In all cases involving the arrest or charge of an employee for any criminal offense, the Company may, at any time, conduct an independent review of the facts and determine whether disciplinary or other employment action is warranted.

Dotson Dep. at ex. 4, at 16.

On June 28, 2009, Dotson was arrested for operating a vehicle while intoxicated (OVWI) while off duty in his personal vehicle. Dotson Aff. at ¶ 4. Dotson called Earnest from jail to inform her that he would need a day off. Dotson Aff. at ¶ 6. He asserts that during the same phone call, he informed Earnest that he was arrested and in jail. *Id.* Earnest states that she does not remember Dotson saying that he was arrested during the June 28, 2009 phone call. Earnest Dep. at 11. She states that he may have told her that he was arrested, but she did not hear it. Earnest Dep. at 21. On July 15, 2009, Dotson was informed that his license was going to be suspended. Dotson Aff. at ¶ 7. On the same day, Dotson met with Earnest and informed her that his license was going to be suspended

due to his arrest. Earnest Dep. at 14. Dotson told Earnest that he had a Court date on July 21, and he believed his OVWI charge would be reduced to public intoxication. Dotson Dep. at 103. Earnest told Dotson that she would not report his arrest to her boss until after Dotson's next court date. Earnest Dep. at 15. Earnest immediately prohibited Dotson from driving Company vehicles. *Id.*

After Dotson's July 21, 2009 court date, Earnest understood that Dotson's license remained suspended and he was still charged with OVWI. Earnest Dep. at 16-17. Earnest reported Dotson's arrest and license suspension to her supervisor, Gleissner. *Id.* Gleissner advised Earnest to report Dotson's arrest to HR. *Id.* The Company did not formally discipline Earnest for her failure to immediately report the matter to HR. *Id.* On July 22, 2009, Earnest informed Dotson, with a union representative present, of Lawton's decision to suspend Dotson pending an investigation as to whether Dotson timely informed the Company of his arrest as required by the COBC. Dotson Dep. at 108-09.

During Dotson's suspension, Jeff Larkin ("Larkin"), Asset Protection Lead Analyst, investigated Dotson's arrest. Dotson Dep. at 111; Dotson Dep. at ex. 10. On July 28, 2009, Larkin interviewed Dotson with Earnest and a Union representative present. Dotson Dep. at 111-14; Dotson Dep. at ex. 10. After completing the interview, Larkin and Dotson prepared a collaborative statement summarizing the information Dotson provided during the interview. Dotson Dep. at 112-14; Dotson Dep. at ex. 10. Dotson did not ask to change any part of the statement or characterize any of its contents as inaccurate. Dotson Dep. at 113. Dotson read the statement, initialed and signed it, and acknowledged its truth. Dotson Dep. at 114. In the statement, Dotson acknowledged that he knew of the COBC's arrest-reporting requirement and that he understood his employment could be terminated

4

for violating the COBC. Dotson Dep. at ex. 10. The statement also provided that Dotson was not sure whether Earnest heard him state that he was in jail during the June 28, 2009 phone call. *Id.*

Earnest prepared written summaries of her June 28, July 14, and July 15 conversations with Dotson as part of the investigation. Earnest Dep. at 27-28. Earnest stated that on June 28 she only heard Dotson request to be off work on June 29 and June 30. Earnest Dep. at exs. 10 & 11. Earnest summarized her July 14 conversation with Dotson by explaining that Dotson called her and requested a day off, which she granted. Earnest Dep. at ex. 10. Earnest summarized her July 15 meeting with Dotson, stating that Dotson informed her of his license suspension as a result of an OVWI charge, and that after his July 20, 2009 court appearance, Dotson believed his charge would be reduced to public intoxication. Earnest Dep. at ex. 11.

Larkin prepared an executive summary of his investigation and provided it to Earnest and Lawton among others. Lawton Dep. at 25; Lawton Dep. at ex. 3. Lawton reviewed the summary and contacted Earnest by phone. Lawton Dep. at 17-19. Earnest told Lawton that during her brief telephone conversation with Dotson on Sunday, June 28, he did not tell her he had been arrested, and only requested vacation time. Lawton Dep. at 18-19.

On July 30, 2009, the Company informed Dotson that his employment status had been changed to suspended pending termination. Dotson Dep. at 123. On August 20, 2009, Lawton, Dotson's Union representatives, and others held a Review Board meeting to discuss the basis for the Company's contemplated termination decision under the terms of the collective bargaining agreement ("CBA"). Dotson Dep. at 123-24. Dotson had the opportunity to tell his side of the story at this meeting. Dotson Dep. at 124. At the meeting,

he stated that when he called Earnest on June 28, he spoke with his shirt over his mouth and he was in tears and that he spoke quickly because he did not want to get the officer who let him use his cell phone in trouble. Dotson Dep. at 124-26.

Following the Review Board meeting, Lawton made the decision to proceed with the termination of Dotson's employment. Lawton Dep. at 14. Lawton concluded that Dotson violated the COBC by failing to report his arrest in a timely fashion, and that this violation warranted termination because of the nature of Dotson's OVWI charge and his position as a Heavy Vehicle Driver. Lawton Dep. at 20. On August 24, 2009, the Company informed the Union that it had decided to proceed with termination of Dotson's employment. Dotson received notice of the Company's decision through a telephone call from a Union representative, and he understood that the Company's articulated reason for its decision was that he failed to timely report his OVWI arrest as required by the COBC. Dotson Dep. at 130.

Pursuant to the CBA between the Company and the Union, the parties submitted the issue of whether the Company had just cause to terminate Dotson's employment to final and binding arbitration. On August 18, 2011, Arbitrator Daniel Brent heard testimony from Earnest, Lawton, and Dotson. Arbitrator Brent also received documentary evidence from the parties. The parties submitted post-hearing briefs. On November 7, 2011 Arbitrator Brent issued his decision in favor of the Company. Def.'s Ex. F.

The Court includes additional facts below as necessary.

## II. **STANDARD**

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable

inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. DISCUSSION

Dotson alleges that when the Company terminated his employment, it discriminated against him on the basis of his race in violation of Title VII and § 1981. Under both statutes, Dotson may prove his case through either the direct or indirect method of proof. *See Brown v. Illinois Dep't Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007).

The indirect, "burden-shifting" approach requires Dotson to prove a prima facie case of discrimination by a preponderance of the evidence. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). To establish a prima facie case of unlawful discrimination, Dotson must

prove (1) he is in a protected class, (2) he was meeting legitimate employment expectations, (3) he suffered an adverse employment action, and (4) the employer treated similarly situated individuals outside of his protected class more favorably. *Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009). If Dotson is unable to prove his prima facie case, summary judgment must be entered in favor of the defendant. *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 676 (7th Cir. 2006). If, however, Dotson establishes all four elements of his prima facie case, the burden shifts to the Company to articulate a legitimate, nondiscriminatory reason for terminating Dotson's employment. *Naik v. Boehringer Ingelheim Pharms.*, 627 F.3d 596, 600 (7th Cir. 2010). If the Company meets its burden, Dotson must demonstrate that the reasons the Company offered for his suspension are pretextual. *Id.*

It is undisputed that Dotson, an African-American, is a member of a protected class and that when the Company terminated his employment, Dotson suffered an adverse employment action. The Company asserts that Dotson was not meeting its legitimate employment expectations because he failed to report his arrest in a timely manner pursuant to the COBC. Dotson contends that the Company applied the COBC reporting requirements in a discriminatory manner. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner . . . the second and fourth prongs merge – allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 228 F.3d 319, 329 (7th Cir. 2002). That scenario is present here. Dotson does not deny that the Company was not aware of his arrest until July 15, 2009. Instead, he argues that there are at least four similarly situated Caucasian employees who made similar errors

9

under the COBC reporting requirements without being terminated for their errors. Accordingly, the Court proceeds to the pretext analysis.

"A pretext . . . is a deliberate falsehood." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). To show pretext, Plaintiff must establish "by a preponderance of the evidence that the legitimate reasons offered by . . . [Defendants'] were not [their] true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotes omitted). "[I]t is not enough for a plaintiff to show that his employer's explanation was based on an inaccurate assessment of its employee's performance." *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Instead, "[p]retext means a dishonest explanation, a lie rather than an oddity or an error." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

"[C]omparator evidence is relevant at the pretext stage." *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012). Indeed, "[i]n order to demonstrate pretext under the McDonnell Douglas analysis, a plaintiff may put forth evidence that (1) employees outside of the protected class . . ., (2) who were involved in acts of comparable seriousness, (3) were nevertheless retrained or rehired (while plaintiff was not)." *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994). Therefore, the same inquiry into similarly situated employees may be made at the pretext stage as is made at the fourth prong of the prima facie case. *See Coleman*, 667 F.3d at 857; *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998). In order for employees to be "similarly situated" to Dotson, those employees must be comparable to him in all material respects. *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846-47 (7th Cir. 2006). However, the inquiry as to whether two employees are "similarly situated" is one of common sense that depends upon the

employment context. *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008). Indeed, Dotson need not "present a doppelganger who differs only by having remained the employer's good graces." *Id.* However, Dotson must show "substantial similarity" between herself and the alleged similarly situated employee such that "confounding variables, such as differing roles, performance histories, or decision-making personnel" are eliminated. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). "In other words, the inquiry simply asks if there are sufficient commonalities on the key variables between [Dotson] and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* Dotson presents four Caucasian individuals as comparators. The Court examines each in turn.

First, Dotson contends that his supervisor, Earnest, is similarly situated to him in all material respects but was not treated as harshly. Specifically, Dotson argues that he and Earnest dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct, but Dotson's employment was terminated as a result of the conduct, but Earnest was not formally disciplined. *See Rogers v. White*, 657 F.3d 511, 518 (7th Cir. 2011).

The Company argues that Earnest is not similarly situated to Dotson because she is a supervisor and she did not engage in conduct of comparable seriousness to Dotson. Typically supervisors make poor comparators for plaintiffs claiming employment discrimination because employees of differing ranks generally have differing job duties or performance standards. However, in situations such as this where uneven discipline is the basis of the discrimination claim, a supervisor who engaged in similar misconduct, was

11

subject to similar performance standards, and shared a disciplining supervisor with the subordinate may be similarly situated to the subordinate. *See Rogers*, 657 F.3d at 517-518. Accordingly, the fact that she is Dotson's supervisor is not enough, on its own, to establish that Earnest is not similarly situated to Dotson.

The Company also argues that Earnest's failure to report was not of comparable seriousness to Dotson's failure to report because Dotson's failure to report allowed him to continue driving after his arrest, opening the Company to potential liability and reputational damage. The Company asserts that because Earnest immediately prohibited Dotson from driving upon learning of his arrest, even though she did not report the arrest, her failure to report was less serious. Lawton Dep. at 39 (stating that Lawton enforced the COBC as he did because Dotson's failure to timely report his arrest opened up the Company to potential liability).

The Court focuses on the portion of the Company's argument that concerns liability. The parties dispute whether the Company actually believed that Dotson's driving in the period between his arrest and the BMV's notice that his license had been suspended opened it to potential liability. Dotson cites evidence of another driver, Jack Simon ("Simon"), who was arrested for a DUI but permitted to continue driving company vehicles until his court date in support of his argument that the Company was aware that there was no potential liability for Dotson's driving between when he was arrested and when his license was suspended. *See* Lawton Dep. at ex. 11; dkt. no. 47-12 at 3. However, Simon provided his supervisor with a form from the police department stating that Simon could continue to legally drive until his court date and that the outcome would determine the next step. *See id.* Dotson provided the Company with no such documentation. Accordingly,

that the Company allowed Simon to continue driving after his arrest does not suggest a broad understanding on the part of the Company that such behavior is always prudent or legal.[1]

Additionally both parties provide the Court with citations to Indiana statutes intended to support their respective positions regarding the potential for liability based upon Dotson's continued operation of company vehicles after his arrest. The Court declines to comment on the actual legality of Dotson's driving after his arrest. Instead, the Court's focus is properly on whether the Company believed that Dotson's behavior created liability concerns where Earnest's did not. *See Stewart*, 207 F.3d at 378 (stating that pretext means a deliberate falsehood, not an oddity or error). Dotson has pointed to no evidence suggesting that the Company did not honestly believe that his behavior created potential liability. Therefore, because Earnest's behavior and Dotson's behavior was not of comparable seriousness, they are not similarly situated such that deviation in their treatment suggests pretext.

Dotson next points to Edward Brewer ("Brewer") as a potential comparator. Brewer was a Supply Attendant who reported to Earnest. Earnest Dep. at 32-33. As a Supply Attendant, Brewer drove a 26,000 pound straight truck to different garages in Indiana and needed a Class B CDL to perform his job duties. *Id.* On March 17, 2009, Brewer was pulled over for a lane violation while operating a Company vehicle. Earnest Dep. at 39-40. He was cited for the lane violation and for driving a commercial vehicle with a disqualified

---

[1] Although the Company raised concerns about the admissibility of the Simon evidence, the Court declines to comment its admissibility because the Court concludes that its substance does not further Dotson's arguments on the merits.

CDL. Earnest Dep. at 34. The police did not allow Brewer to continue driving, and Dotson had to complete Brewer's route. Dotson Aff. at ¶ 12. The same day, Brewer went to the BMV to remedy his CDL disqualification, but while he was there, the BMV provided Brewer with a letter dated October 6, 2008 that stated Brewer's CDL was disqualified on May 2, 2008. Earnest Dep. at 41-42; Earnest Dep. at ex. 16. Brewer brought the letter to Earnest the following day, and informed her that he had not received the letter and he was not aware that his CDL had been disqualified prior to March 17, 2009. Earnest Dep. at 38-39, 41. Earnest stated that she had no reason to believe that Brewer had prior knowledge of his CDL disqualification. Earnest Dep. at 40. The Company did not discipline Brewer for failure to report his CDL disqualification.

Although the existence of the October letter from the BMV addressed to Brewer's personal residence does create some question as to whether Brewer timely reported his CDL disqualification to the Company, Lawton stated in his deposition that he did not have knowledge of Brewer or the situation regarding Brewer's CDL. Lawton Dep. at 40, 42. Dotson argues that there is no way that Lawton could not have known about the situation, but he does not provide any evidence to support his argument. In order to prevent summary judgment, Plaintiff must do more than "raise a metaphysical doubt as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001). Accordingly, because Lawton, the disciplining supervisor, did not know about Brewer's alleged COBC violation, Brewer and Dotson are not similarly situated. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 827 (7th Cir. 2008).

In conjunction with his assertions regarding Brewer, Dotson notes that Earnest did not report Brewer's CLD disqualification to HR, but was never disciplined. Earnest Dep. at 37. Dotson argues that the Company's more favorable treatment of Earnest with respect to her failure to report leads to an inference of pretext. However, Earnest did not allow Brewer to continue to drive on his suspended CDL once she was aware that it had been suspended. Dotson Aff. at ¶ 12. Accordingly, the liability concerns that the Company held with respect to Dotson's failure to timely report are different than those concerning Earnest's failure to timely report Brewer's CDL disqualification. Therefore, the Company's failure to discipline Earnest concerning her failure to report Brewer's CDL disqualification does not lead to an inference of pretext with respect to its stated reason for terminating Dotson's employment.

Dotson asserts that Kim Kimbrell ("Kimbrell") is another similarly situated Caucasian individual who was treated more favorably. Kimbrell is a Distribution Operator that worked under Gwen Hochstetler's ("Hochstetler") supervision. Hochstetler Dep. at 9. As a Distribution Operator, Kimbrell drove a fork truck in the building but did not operate Company vehicles on public roadways. *Id.* On September 17, 2008, Kimbrell was charged with driving under the influence ("DUI"). Kimbrell Aff. at ¶ 3. In October 2009, the Company received an anonymous call alleging that Kimbrell had failed to report his DUI arrest. Hochstetler Dep. Ex. 4. Hochstetler asserts that Kimbrell's wife called and informed her that Kimbrell had been arrested on the same day that Kimbrell was arrested, but that Hochstetler did not then report it to anyone. Hochstetler Dep. at 9-11. The Company initiated an investigation, and Kimbrell received a final warning. Lawton Dep. at 35. Kimbrell's alleged failure to timely report his arrest is not of comparable seriousness to

Dotson's failure to timely report his arrest because Dotson drives Company vehicles on public roads and Kimbrell does not. Accordingly, Kimbrell and Dotson are not similarly situated such that the Company's more favorable treatment of Kimbrell could lead to an inference of pretext. *See Humphries*, 474 F.3d at 405.

Finally, Dotson asserts that Hochstetler is similarly situated to Dotson because she failed to report Kimbrell's arrest pursuant to the COBC, but she only received a letter of reprimand. Lawton Dep. at 37. Like the Company believed that Earnest's failure to report Dotson's arrest and Brewer's CDL suspension did not open it to potential liability, so the Company believed that Hochestetler's failure to report Kimbrell's arrest was not as serious as Dotson's failure to timely report his arrest. Accordingly, Dotson and Hochstetler are not similarly situated such that the Company's more favorable treatment of Kimbrell could lead to an inference of pretext. *See Humphries*, 474 F.3d at 405.

Although Dotson has not presented sufficiently similarly situated employees to create an inference of pretext, the Court's analysis does not stop there. Dotson asserts that the Company shifted its explanation for its employment decision by stating in its briefing that Dotson's failure to report was more serious than any of his alleged comparators' reporting failures because of both potential liability and reputational damage, but Lawton testified that Dotson's behavior was more serious because of potential liability without mentioning reputational damage. *See* Lawton Dep. at 39. In support of his argument that this is a sufficient difference in explanation of the challenged employment decision that the Court should infer pretext, Dotson cites *Appelbaum v. Milwaukee Metropolitan Sewerage District*, 340 F.3d 573, 579 (7th Cir. 2003). In *Appelbaum*, the defendant initially stated that it fired the plaintiff because of her poor work performance and

16

a confidentiality breach. Id. At trial, however, the defendant abandoned the charge of poor work performance and said that it played "zero role" in the termination decision. Id. That shift in explanation prompted the Seventh Circuit to note that "[o]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." Id. In this case, however, the Company consistently cited liability concerns as underpinning the determination that Dotson's failure to report was more serious than any other alleged in the briefing. In its briefing supporting its motion for summary judgment, the Company adds reputational damage to its explanation, but that is not inconsistent with its reliance on the potential for liability as the reason for its decision to terminate Dotson. Certainly, the addition of reputational damage to its explanation, which is a natural extension of a concern for potential liability, is not the same as completely abandoning a stated reason for the challenged employment decision as the defendant did in *Appelbaum*. Accordingly, the Court concludes that the Company's augmentation of its explanation for Dotson's termination does not lead to an inference of pretext. Therefore, because Dotson has not presented any evidence suggesting that the Company's stated explanation for its termination decision is anything other than an honestly held belief, the Court concludes that he fails to fend off summary judgment under the indirect burden-shifting method. *Reeves*, 530 U.S. at 143.

Dotson also argues that he can avoid summary judgment under the direct method. Under the direct method, Dotson survives summary judgment if he can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). The focus of the direct method of proof is not whether the evidence offered is itself "direct" or "circumstantial" but

17

rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Atanus*, 520 F.3d at 671. Direct evidence of discrimination like an admission from the decision maker that the adverse employment action was motivated by discriminatory animus is rare. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). However, "[d]irect proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion . . . but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Atanus*, 520 F.3d at 671. Circumstantial evidence to support an allegation of discrimination under the direct method can include "evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment." *Darchak*, 580 F.3d at 631.

Dotson relies upon his alleged comparators to provide a "convincing mosaic" of circumstantial evidence. *Coleman*, 667 F.3d at 860 (7th Cir. 2012). However, as discussed above, Dotson's proffered comparators do not support an allegation of discrimination because the Company did not perceive the alleged comparators to have engaged in conduct of comparable seriousness to the conduct Dotson engaged in that provided the reason for his termination. Therefore, Dotson cannot resist summary judgment under the direct method. Accordingly, the Court **GRANTS** summary judgment in favor of the Company.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's, AT&T Services, Inc., Motion for Summary Judgment [dkt. no. 39]. Plaintiff, Derrick Dotson, shall take nothing by way of his Complaint. Judgment shall enter accordingly.

IT IS SO ORDERED this 16th day of July, 2012.

```
_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana
```

Distribution to:

Laura A. Lindner
LITTLER MENDELSON, P.C.
llindner@littler.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com